**EDELINE JULMISSE PROSPER**,

      Plaintiff,

v.

**ANTHONY MARTIN**,

      Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendant, Anthony Martin's Motion for Final Summary Judgment [ECF No. 102]. Plaintiff, Edeline Julmisse Prosper, filed a Response [ECF No. 117]; to which Defendant filed a Reply [ECF No. 141].[1] The Court has carefully considered the Third Amended Complaint [ECF No. 60] ("TAC"), the parties' submissions, the record, and applicable law.

## I.      BACKGROUND

This case arises out of a fatal encounter on September 28, 2015, between Junior Prosper ("Prosper") and Defendant, Miami-Dade police officer Anthony Martin. (*See* TAC ¶ 3). Plaintiff, Edeline Julmisse Prosper, was Prosper's wife and is the personal representative of his estate. (*See id.* ¶¶ 3–4).

The incident began when William Devy, a bus driver, witnessed a taxi cab colliding with

---

[1] The parties' factual submissions include: Defendant's Statement of Undisputed Material Facts [ECF No. 103] ("Def.'s Facts"); Plaintiff's Response in Opposition to Defendant's Statement of Facts [ECF No. 132] 1–10 ("Pl.'s Reply Facts"); Plaintiff's Statement of Additional Material Facts [ECF No. 132] 10–18 ("Pl.'s Add'l Facts"); and Defendant's Response to Plaintiff's Statement of Additional Facts [ECF No. 141] 14–18 ("Def.'s Reply Facts").

a street sign near the on-ramp to I-95. (*See* Def.'s Facts ¶¶ 2–3).[2] Devy stopped to assist and approached the taxi, which was still running with its lights on. (*See id*. ¶ 4). Devy saw Prosper sitting in the driver's seat, slumped toward the passenger side of the car and breathing heavily. (*See id*. ¶ 5). Devy called 911 and informed the operator of the accident. (*See id.* ¶ 7). While Devy was speaking with the 911 operator, Prosper moved across the front seat of the car, exited through the passenger door, and began walking toward I-95. (*See id.* ¶ 10).

Raul Sandoval, a tow truck operator, passed Devy on the side of the road and pulled over to offer assistance. (*See id.* ¶ 18). Soon after, Defendant arrived on the scene, rolled down his window, and spoke with Devy and Sandoval. (*See id*. ¶¶ 27–28). Devy and Sandoval told Defendant they believed Prosper "was on something" and was "acting weird." (*Id.* ¶ 28; Martin Dep. [ECF No. 103-8] 46:11–18). They also informed Defendant that Prosper had jumped out of the passenger side of the taxi and was running up the ramp toward I-95. (*Id.* ¶ 29; Martin Dep. 46:11–18). Defendant proceeded onto the ramp in pursuit of Prosper with his emergency lights flashing. (*See* Def.'s Facts ¶ 33).

As Defendant approached Prosper, Defendant issued several commands through his patrol car speaker, which Prosper ignored. (*See id.* ¶ 34; Martin Dep. 49:15–50:4).[3] Prosper appeared —

---

[2] All facts are considered undisputed unless otherwise indicated.

[3] Plaintiff denies Prosper ignored verbal commands. (*See* Pl.'s Reply Facts ¶ 34). Yet, Plaintiff fails to provide any evidence or citation to the record to controvert this fact. (*See id*.). As Plaintiff fails to provide any evidence to the contrary, the Court deems it admitted. *See* Local Rule 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement . . . ." (alteration added)); *see also Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1305 (S.D. Fla. 2010), *aff'd*, 477 F. App'x 702 (11th Cir. 2012) ("[I]n accordance with Local Rule [56.1], where a party has failed to direct the Court to evidentiary support in the record for any proposed contravening material fact, the Court deems the corresponding proposed uncontroverted material fact admitted for purposes of the [motion] for [s]ummary [j]udgment, provided that the Court finds the statement of material fact at issue to be supported by the evidence." (alterations added; footnote call number omitted)).

at a minimum — to be disoriented and stumbling as he walked within a few feet of I-95. (*See* Pl.'s Add'l Facts ¶ 114; Def.'s Facts ¶ 35). Defendant, having been told by Devy and Sandoval they thought Prosper was "on something," and having observed Prosper's unusual gait, suspected Prosper was under the influence of drugs. (*See* Def.'s Facts ¶¶ 35–36). Because it appeared Prosper was about to walk into traffic, Defendant exited his patrol car and tried to redirect Prosper away from the highway. (*See id.* ¶ 39). In recounting the events that took place after Defendant exited his vehicle, Plaintiff relies on a surveillance recording from a nearby building, provided by Biscayne Air Conditioning, Inc. [ECF No. 105] (the "Biscayne Air Video"). The Biscayne Air Video represents Plaintiff's primary source of evidence in this action.

The parties disagree on several points about the ensuing interaction between Defendant and Prosper. Defendant claims he tried to redirect Prosper, for his safety, away from the highway by placing his hand on Prosper's shoulder. (*See* Def.'s Facts ¶ 39).[4] Defendant states Prosper then struck him, and he struck Prosper back. (*See id.* ¶ 42, 46). Defendant states this physical struggle caused the parties to fall down an embankment on the side of the road. (*See id.* ¶ 47). According to Plaintiff, no punches were thrown and the parties simply "lost their balance and fell into the bushes along the embankment . . . ." (Pl.'s Reply Facts ¶¶ 42–47 (citing Biscayne Air Video)). Defendant states after this initial altercation occurred, Defendant intended to arrest Prosper and take him into custody. (*See* Def.'s Facts ¶ 44).[5]

---

[4] Plaintiff denies this fact, stating the Biscayne Air Video shows "it did not appear Prosper would walk onto [*sic*] highway or that Martin put his hand on Prosper's shoulder." (Pl.'s Reply Facts ¶ 39). But in her own facts, Plaintiff asserts Prosper was disoriented and stumbling along the highway (*see* Pl.'s Add'l Facts ¶ 114), and that Defendant "put his hands on Prosper's shoulder" (*id.* ¶ 124). Consequently, the Court accepts the fact as admitted.

[5] According to Defendant, Prosper had committed arrestable offenses by violating the following sections of the Florida Statutes: section 316.061(1), by leaving the scene of an accident (*see* Def.'s Facts ¶ 100); section 316.130(18), by walking on a limited access facility (*see id.* ¶ 101); section 316.072(3), by failing

Once Defendant regained his footing, he took out his Taser, which had an attached light. (*See id.* ¶ 49). According to Defendant, Prosper appeared disoriented and aggressive, while refusing verbal commands. (*See id.* ¶¶ 48–50). Because Prosper was moving toward Defendant, Defendant discharged the Taser, and Prosper fell down the embankment. (*See id.* ¶¶ 51–52). Plaintiff denies this version of events. Relying solely on the Biscayne Air Video, Plaintiff states Defendant got up after losing his balance and discharged the Taser at Prosper, who remained lying on the ground. (*See* Pl.'s Add'l Facts ¶¶ 139–142).

After the initial Taser discharge, Defendant lost sight of Prosper, but could hear him trying to escape through the vegetation. (*See* Def.'s Facts ¶ 53).[6] Sandoval, who had followed the parties onto the ramp to provide assistance, heard Defendant telling Prosper to "[s]top," "[d]on't move," and "[c]ome back." (Sandoval Dep. 188:7–11 (alterations added); Def.'s Facts ¶¶ 77–78). At this point, Defendant deployed the Taser a second time to prevent Prosper from escaping. (*See* Pl.'s Add'l Facts ¶ 144). Defendant then moved along the embankment and called dispatch to report that Prosper was trying to escape. (*See* Def.'s Facts ¶¶ 54–55).[7]

Defendant saw Prosper moving away from him through the vegetation, and Defendant proceeded down the embankment after him. (*See id.* ¶ 56; *see* Resp. 3). Defendant caught up to

---

to obey commands from a police official (*see id.* ¶ 102); and sections 784.03(1)(a)(1) and 784.07(2)(b), by striking, making physical contact with, and/or pulling away from Defendant (*see id.* ¶ 104).

[6] It is unclear why Plaintiff denies this statement. (*See* Pl.'s Reply Facts ¶ 53). Plaintiff's citation to the Biscayne Air Video undisputedly shows Prosper moving through the vegetation and away from Defendant. (*See* Biscayne Air Video 4:14:30–4:14:42). Plaintiff states "Martin was using a flashlight, creating inference [sic] he could see Prosper." (Pl.'s Reply Facts ¶ 53 (alteration added)). Yet, in her statement of facts, Plaintiff asserts Defendant "could not see Prosper while he was in the brush after the first Taser strike and could only hear him moving." (Pl.'s Add'l Facts ¶ 145). As both parties independently agree to these facts, the Court accepts them as admitted.

[7] Plaintiff denies Defendant called dispatch to advise Prosper was attempting to escape (*see* Pl.'s Reply Facts ¶ 54) but admits Defendant "said something indecipherable over the dispatch frequency" (*id.* ¶ 55).

Prosper, who had tripped over vegetation and was on the ground. (*See* Def.'s Facts ¶ 57; Pl.'s Add'l Facts ¶ 149). Defendant was standing on higher ground, slightly above Prosper, who was facing Defendant. (*See* Def.'s Facts ¶ 80). Prosper ignored Defendant's verbal orders to stop moving and to stay on the ground. (*See id.* ¶ 78; Sandoval Statement [ECF No. 103-6] 33:15–17).[8]

At this point in the altercation, Defendant had neither reached for nor taken out his firearm. (*See* Def.'s Facts ¶ 58).[9] Defendant attempted to arrest Prosper by using his Taser to dry stun him. (*See id.* ¶ 59).[10] According to both Defendant and Sandoval, Prosper lunged at Defendant, pulling him down onto the ground. (*See id.* ¶ 61; Sandoval Statement 21:2–24). Plaintiff disputes this fact, arguing the Biscayne Air Video could be interpreted to show Defendant tackling Prosper.

---

[8] Plaintiff denies this fact, stating the Biscayne Air Video shows Prosper did not try to get up off the ground. (*See* Pl.'s Reply Facts ¶ 78). Nevertheless, Plaintiff repeatedly references Prosper "rising" from the ground throughout her Response and statements of facts. (*See, e.g.*, Resp. 3 ("Prosper then rises briefly and is seen being tackled by Martin."); Pl.'s Reply Facts ¶¶ 61, 81 (same)). Again, this fact is not disputed by any record evidence, and Plaintiff admits its truth elsewhere. As such, the Court accepts it as admitted.

[9] Plaintiff denies this fact, relying on the Court's August 31, 2018 Order [ECF No. 74], denying Defendant's motion to dismiss the TAC. (*See* Pl.'s Reply Facts ¶ 58). Plaintiff's reliance on the August 31, 2018 Order is misplaced. The Order was based on an undeveloped record at the motion-to-dismiss stage. The Court, drawing all possible inferences in Plaintiff's favor, addressed whether the Biscayne Air Video *could* show Defendant shooting Prosper. (*See id.* 8).

The parties now provide narrative versions of the events, placing the shots fired after the moment in question. (*See* Resp. 3; Reply 6). In her own statement of facts, Plaintiff acknowledges the shooting does not take place as was considered plausible in the Court's Order. (*See* Pl.'s Add'l Facts ¶¶ 149–160). Further, Sandoval states no shots were fired until after he repositioned his tow truck and exited the vehicle. (*See* Sandoval Dep. 178:8–17). Indeed, the flashes of light seen in the Biscayne Air Video are seen several seconds prior to Sandoval's repositioning of the truck, and the record evidence thus confirms the parties' narratives. (*See* Biscayne Air Video 4:14:56–4:15:08). As the record shows this fact is undisputed, the Court accepts it as admitted.

[10] Plaintiff denies this fact, stating Defendant "may have shot Prosper prior to any bite." (Pl.'s Reply Facts ¶ 59). The bite Plaintiff references occurred during the ensuing physical engagement between Defendant and Prosper. Both parties submitted statements of fact placing the bite after Defendant's attempt to dry stun Prosper. (*See* Pl.'s Add'l Facts ¶¶ 153–163; Def's Facts ¶¶ 59–69). Plaintiff admits the bite in fact took place after the third and final use of the Taser. (*See* Resp. 15 ("[W]e know the tasing took place *before* the minor finger bite." (alteration and emphasis added)). As Plaintiff's denial is not supported by the record evidence, this fact is admitted.

(*See* Pl.'s Reply Facts ¶ 61).

During this struggle on the ground, Defendant and Prosper moved down the embankment and out of Sandoval's sight. (*See* Def.'s Facts ¶ 83; Pl.'s Reply Facts ¶ 83). Sandoval then repositioned his truck to shine its headlights on the area where Defendant and Prosper were seen falling. (*See id.*). Sandoval exited his truck and walked toward the embankment. (*See id.*). Several seconds after exiting his vehicle, Sandoval heard gunshots but was unable to see who had fired the weapon. (*See* Def.'s Facts ¶ 84; Pl.'s Reply Facts ¶ 84).

According to Defendant, during the final altercation with Prosper, he was in excruciating pain as Prosper bit down on his finger while twisting his head left and right. (*See* Def.'s Facts ¶¶ 62–63). Defendant claims his finger began to go numb and he feared Prosper might sever his finger entirely. (*See id.* ¶¶ 65–66). Fearing for his life and suffering great bodily harm, Defendant unholstered his firearm and discharged it, shooting Prosper in an attempt to free his hand from Prosper's mouth. (*See id.* ¶ 67). Instead of releasing Defendant's finger, Prosper bit down harder. (*See id.* ¶ 68). As Prosper continued to bite down on Defendant's finger, Defendant discharged his firearm a second time. (*See id.*). Prosper did not release Defendant's finger, and Defendant discharged his firearm a third time, at which point Prosper finally released Defendant's finger. (*See id.* ¶ 69).

Plaintiff denies these facts. (*See* Pl.'s Reply Facts ¶¶ 62–69). Plaintiff submits an alternate version of the incident, stating that after Defendant tackled Prosper, Defendant punched Prosper in the face multiple times, causing him to bleed from the mouth. (*See* Pl.'s Add'l Facts ¶ 156). Plaintiff does not seem to deny a bite occurred, but rather Plaintiff disputes how the bite occurred.[11]

---

[11] (*See* Resp. 3 ("The Jury could find [Defendant's finger] lodged [in Prosper's mouth] while Martin was punching Prosper in the mouth. Martin then shoots Prosper the first time, causing him to bite down harder, or so the jury could find." (alterations added)); 15 ("[W]e know that the tasing took place before the minor

Plaintiff speculates as Defendant was above Prosper and in the process of punching him, Defendant's finger became lodged in Prosper's mouth. (*See id.* ¶¶ 157–158).[12] Defendant then unholstered his firearm and shot Prosper multiple times. (*See id.* ¶¶ 159–160).

Prosper died as a result of the gunshot wounds. (*See id.* ¶ 161). Defendant proceeded up the embankment toward I-95 and immediately called dispatch, reported shots fired, and requested dispatch send fire rescue. (*See* Def.'s Facts ¶ 70). Defendant reported to dispatch Prosper had tried to bite his finger off. (*See id.* ¶ 71). Sandoval saw Defendant bleeding from his hand. (*See id.* ¶ 72; Sandoval Dep. 194:11–12).

Defendant was taken to Jackson Memorial Hospital for treatment. (*See* Def.'s Facts ¶ 89). Special Agent John A. Subic of the Florida Department of Law Enforcement photographed Defendant in the hospital and reported Defendant was seen with his uniform on, numerous sand spurs on his pants and shirt, a bandaged index finger, blood on his shirt and arm, and a swollen face. (*See id.* ¶ 90).[13] Defendant suffered three separate injury patterns on the top of his finger and one below the finger. (*See id.* ¶ 92). The Jackson Memorial Medical Record notes Defendant "was bit on his left index finger over the PIP joint today by another human . . . . The wounds appear to be superficial." (First Jackson Medical Record [ECF No. 131-3] 39).

The bite on Defendant's finger caused tissue displacement — consistent with head movement by the person biting. (*See* Def.'s Facts ¶¶ 94–95).[14] Although the bite on Defendant's

---

finger bite"); 19 ("Here, a reasonable jury could find that the bite was defensive — not offensive — perhaps entirely involuntary.")).

[12] Plaintiff arrives at this characterization of the events from Defendant's statement, "when I was going down to make the contact, that's when Mr. Prosper hopped up and put my finger in his mouth." (Pl.'s Add'l Facts ¶ 158 (citing Martin Dep. 135:13–21)).

[13] Plaintiff disputes Defendant's face was swollen based on the photographs. (*See* Pl.'s Reply Facts ¶ 90).

[14] Plaintiff denies these facts. (*See* Pl.'s Reply Facts ¶¶ 94–95). Yet, each record Plaintiff cites fails to controvert Defendant's statements. (*See id.*; Pl.'s Add'l Facts ¶¶ 164–167). Plaintiff cites a First Jackson

finger was described as "superficial at skin level only" (Pl.'s Add'l Facts ¶ 165), the bite is consistent with causing pain (*see* Briggle Dep. 66:7–20) and could have caused temporary numbness (*see id*. 72:16–20). On October 22, 2015, Defendant was cleared to return to work full duty and no functional limitations were identified. (*See* Pl.'s Add'l Facts ¶ 170).

The TAC states one claim under 42 U.S.C. section 1983 for excessive force and deprivation of life. (*See generally* TAC). Plaintiff contends Defendant's uses of his Taser and firearm, respectively, were excessive.[15] (*See id*.). Regarding the instant Motion, Plaintiff insists her challenges to Defendant's credibility as well as ambiguities in the video evidence create triable questions of fact precluding summary judgment. (*See* Resp. 7–8).

Defendant argues Plaintiff "cannot simply manufacture a genuine dispute by seeking to establish an alternative version of events" based upon "unsupported allegations and her speculative interpretation of a grainy video." (Reply 2). Defendant further contends Plaintiff cannot overcome summary judgment on the basis of a credibility challenge without offering evidence to contradict the material facts. (*See id*. (citation omitted)). Defendant seeks entry of final summary judgment, arguing he is entitled to qualified immunity as to all allegations in the TAC. (*See generally* Mot.).

---

Medical Record 39 (noting Defendant was bit and the wound appears superficial); Second Jackson Medical Record [ECF No. 131-4] 38 (Defendant "sustained a human bite to the left index finger this morning. Patient is a police officer and was arresting someone when the person bit the officer's index finger causing dorsal and volar wounds over the PIP joint. At this time, the patient is reporting pain in the left index finger."); and a University of Miami Hospital Record [ECF No. 131-5] 9 (noting Defendant suffered a human bite and the wound was treated by fire rescue). As Plaintiff provides no evidence to controvert these facts, the Court accepts them as admitted.

[15] Defendant argues Plaintiff "has never alleged an excessive force [sic] premised exclusively on the use of the Taser." (Reply 13). The undersigned has previously noted the TAC's allegations are "threadbare." (August 31, 2018 Order 7). Nonetheless, the TAC does include allegations the "Taser effected [sic] and harmed [Prosper]" and "[Prosper] had not done or said anything that necessitated the use of [the Taser] against [him]. . . ." (TAC ¶¶ 22–23 (alterations added)). These allegations have been repeatedly raised throughout the course of this action. (*See, e.g.*, Response in Opposition to Motion to Dismiss [ECF No. 69] 2 ("[T]he video shows that Defendant Martin's deployment of a taser and firearm to seize Mr. Prosper lacked any rationale, legal or otherwise." (alteration added))).

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Courts must consider the entire record and not just the evidence singled out by the parties. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added; citation omitted). "If reasonable minds might differ on the inferences arising from undisputed facts, then . . . [c]ourt[s] should deny summary judgment." *Id.* (alterations added; citations omitted). Additionally, courts cannot weigh conflicting evidence. *See Skop v. City of Atlanta,*

*Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

## B. Qualified Immunity

The defense of qualified immunity raised in response to the claim in Plaintiff's TAC alters the summary judgment analysis somewhat. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To be entitled to the qualified immunity defense, a government official must demonstrate "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks and citations omitted). When a defendant acts within the scope of his discretionary authority, the burden "shifts to the plaintiff to show that qualified immunity is not appropriate."[16] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted). The plaintiff can show qualified

---

[16] This two-step approach is enshrined in the Eleventh Circuit's *Zeigler/Rich* analysis, which provides:

1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Courson*, 939 F.2d at 1487 (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (per curiam)); *see also Rich v. Dollar*, 841 F.2d 1558, 1563–64 (11th Cir. 1988) (discussing two-part test).

immunity is not appropriate by establishing (1) the defendant's conduct violated his or her constitutional rights; and (2) the constitutional violation was clearly established at the time. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (internal quotation marks and citations omitted). These two requirements may be addressed in any order. *See id.* (citing *Pearson*, 555 U.S. at 236).

The plaintiff "bear[s] the burden of showing that the federal rights allegedly violated were clearly established." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996) (alteration added; citations omitted). To satisfy the "clearly established" requirement, a law may not be "defined 'at a high level of generality,'" and the "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). Although the Supreme Court "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2007) (citations omitted; alterations added).

There are three ways a plaintiff may show a right was clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (internal quotation marks and citation omitted). If case law is used, only decisions of the Supreme Court, Eleventh Circuit, and highest relevant state court can clearly establish the law for qualified immunity purposes. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001)).

In addressing the qualified immunity defense at summary judgment, "[a]ll issues of material fact are resolved in favor of the plaintiff, and then, under that version of the facts, the legal question of whether the defendant is entitled to qualified immunity is determined." *Sparks v. Ingle*, 724 F. App'x 692, 693 (11th Cir. 2018) (alteration added; citation omitted). Applying the plaintiff's "best case," "the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute." *Id.* (internal quotation marks and citation omitted).

## III.    ANALYSIS

The Court addresses Plaintiff's arguments regarding the Biscayne Air Video and Defendant's credibility, and then turns to the merits of qualified immunity as to both the use of non-lethal and lethal force.

### A. Ambiguities in the Biscayne Air Video and Defendant's Credibility

Neither Plaintiff's attempt to bring to the forefront ambiguities in the Biscayne Air Video, nor her attempt to cast doubt on Defendant's credibility, preclude entry of summary judgment.

First, ambiguities in the Biscayne Air Video. Plaintiff argues her version of facts "may include one of two possible interpretations of a video taken of the incident in question." (Resp. 7). Plaintiff relies on *Keels v. Zambrana*, No. 15-CV-80546, 2018 U.S. Dist. LEXIS 119133 (S.D. Fla. July 16, 2018), to support her claim an ambiguous video precludes summary judgment. (*See* Resp. 7–8). Plaintiff's reliance on *Keels* is misplaced. In *Keels*, the plaintiff was the alleged victim of excessive force. *See Keels*, 2018 U.S. Dist. LEXIS 119133, at *13. The plaintiff provided an affidavit detailing his version of events based on his first-hand recollection of the experience. *See id.* The defendants provided a video of the incident, "[b]ut due to the video's poor image quality, lack of sound, unhelpful angle and distance, and unhelpful camera placement as a result of a

horizontal structural pole obfuscating the frame, it provide[d] little value on summary judgment." *Id.* (alterations added). Because the video did not conclusively refute Keels' affidavit, "[d]efendants failed at providing any objective record evidence" warranting summary judgment. *Id.* at *19 (alteration added).

Unlike in *Keels*, Plaintiff has no first-hand knowledge of the events that took place the night of the incident. (*See* Def.'s Facts ¶ 1). Many of Plaintiff's assertions and denials are thus based solely on her speculative interpretation of a video, providing "little value on summary judgment." *Keels*, 2018 U.S. Dist. LEXIS 119133, at *13. To the extent the video can be interpreted to support Plaintiff's allegations, the Court draws all reasonable inferences in her favor. *See Lee*, 284 F.3d at 1194 (citation omitted). Nevertheless, "an inference based on speculation and conjecture is not reasonable." *Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (citation omitted).

Although "[t]he line between circumstantial evidence sufficient to support a finding under a substantial evidence standard and evidence which merely permits conjecture or speculation is difficult to draw," it is the Court's responsibility to do so. *Id.* (alteration added). Given mere conjecture is insufficient to create a genuine issue of fact and noting the video on which Plaintiff relies is "far from a model of clarity" (Mot. 2 (quotation marks and citation omitted)), the undersigned finds ambiguities in the Biscayne Air Video do not preclude entry of summary judgment.

Next, Plaintiff questions Defendant's credibility because "a reasonable jury could find, when the evidence is viewed in the light most favorable to the Plaintiff" that some of Defendant's statements are false. (Resp. 4). Certainly, when evaluating whether a party is entitled to qualified immunity, the Court must take all the facts in the light most favorable to Plaintiff. *See Lee*, 284

F.3d at 1194 (citation omitted). But, "[t]hough factual inferences are made in the [Plaintiff's] favor, this rule applies only '*to the extent supportable by the record*.'" *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) (alteration added; citation omitted; emphasis in original)). Thus, while Plaintiff may question Defendant's credibility, these assertions do not create a genuine dispute when Plaintiff "offer[s] no evidence to contradict the[] *material facts*." *Id.* (alterations and emphasis added; footnote call number omitted).

Plaintiff merely states there are several instances "in which we know or a jury can find that [Defendant] did not tell the truth." (Resp. 7). Plaintiff insists several statements have proven to be false, pointing to the Biscayne Air Video, the testimony of witness Raul Sandoval, the expert opinion of Michael Knox,[17] and the parties' medical records in support. (*See id.* 4). Plaintiff challenges the following statements: (1) Prosper punched Defendant prior to the Taser deployment; (2) Defendant deployed his Taser because Prosper was standing and appeared aggressive; (3) Prosper was attacking Martin from the ground during the third tasing; (4) Defendant pleaded with Prosper to release his finger from Prosper's mouth; and (5) Defendant shot Prosper because he had bitten hard on his finger, causing him to fear it might be severed. (*See id.* 3–4). Even though the challenged statements revolve primarily around non-material facts, the Court addresses each in turn.

Plaintiff relies on the Biscayne Air Video and Knox's opinion to dispute the first three

---

[17] Dr. Michael Knox is the Chief Forensic Consultant at Knox & Associates, LLC. (*See* Forensic Analysis & Reconstruction Report [ECF No. 132-7] 1). Knox's relevant expertise is in Crime Scene Investigation, Analysis & Reconstruction; Firearms, Ballistics & Shooting Incidents; Gunshot Wound Dynamics; Gunshot Residue & Range of Fire Determination; and Bloodstain Pattern Analysis. (*See id.* 2). Plaintiff hired Knox to prepare a report based on Knox's analysis and reconstruction of the incident between Defendant and Prosper, and Knox's opinions as to the reconstructed physics of the interaction between Martin and Prosper are the subject of pending objections to an Order [ECF No. 147] granting in part Defendant's Motion to Exclude Dr. Knox's opinions. (*See* Plaintiff's Rule 72 Partial Objections . . . [ECF No. 148]).

statements — Prosper punched Defendant; Prosper was standing; and Prosper was attacking Martin from the ground. (*See* Pl.'s Reply Facts ¶¶ 42, 48, 59–61). This evidence fails to create any genuine dispute of material facts.

In Knox's own words, Knox is "certainly not suggesting that [the Biscayne Air Video] – that it contradicts [the punch] . . . ." (Knox Dep. [ECF No. 104-2] 74:22–23 (alterations added)).[18] Knox further admits it is possible Prosper is standing after Defendant and Prosper initially fall down the embankment. (*See id.* 66:4–14). Indeed, Knox admits Prosper is not even visible in the Biscayne Air Video at this point. (*See id.*). Sandoval also states during the first application of the taser, "[w]hen I pulled up . . . I do believe that [Prosper] was standing." (Sandoval Dep. 119:25–120:1). The evidence fails to support Plaintiff's assertions, which remain entirely speculative.

Plaintiff then relies on the Biscayne Air Video to controvert Defendant's statement Prosper attacked him from the ground. (*See* Pl.'s Reply Facts ¶ 61). Again, the video simply does not show what transpired between Defendant and Prosper. (*See generally* Biscayne Air Video). Given the video's lack of clarity, the Court cannot make the inference Defendant's statement is not true. What's more, Sandoval's deposition corroborates Defendant's version of events. (*See* Sandoval Dep. 189:7–12). While Prosper was on the ground, Sandoval states he saw Prosper initiate "the 'lunge,' the 'attack,' the 'engagement,' whatever the term is for it . . . ." (*Id.* (alteration added)).

---

[18] Although not cited in her Response, Plaintiff also disputes Defendant's statement regarding the punch with citations to the MDPD Initial Incident Report [ECF No. 132-4]; Barbara Williams' Deposition [ECF No. 132-5]; and Kerry White's Deposition [ECF No. 132-6]. (*See* Pl.'s Reply Facts ¶ 42). Plaintiff's characterization of this evidence fails to persuade. The evidence cited does not specifically say the word "punch." And the evidence fails to contradict Defendant's statement in any material way. (*See* MDPD Report 4 ("As [Defendant] got closer to [Prosper] to take him into custody, they got into a struggle . . . ." (alterations added)); Williams Dep. 31:1–5 (stating she described the events as a "struggle" to avoid confusion); White Dep. 19:20–24 (stating he had little communication with Defendant at the scene because "any kind of shooting the first thing you are supposed to do is separate that officer, put him in the back seat, take his weapon and be quiet. Don't ask him no questions. That's it.")). Reading the statements in their entirety, they fail to create any genuine dispute of material fact. In any event, the Court's analysis does not rely on Defendant's statement regarding the punch.

Plaintiff denies Defendant pleaded with Prosper to release his finger from Proper's mouth. (*See* Pl.'s Reply Facts ¶ 64). Although Plaintiff provides no evidence to contradict Defendant's statement, Plaintiff "submits it is a reasonable inference that if Defendant feared serious bodily harm that justified deadly force, he would not have taken a moment or had the time to beg Prosper to stop biting him." (*Id.*). This fails to create a genuine dispute as to Defendant's statement.

Finally, Plaintiff challenges Defendant's statement that he shot Prosper because Prosper had bitten down hard on his finger, causing him to fear it might be severed. (*See id.* ¶ 66). Plaintiff argues the medical records create "the reasonable inference Martin did not have the fear of bodily harm he alleges." (*Id.*). The bite and circumstances surrounding the bite are discussed in greater detail in Section C of this Order. To be clear, the medical records do not contradict Defendant's statement. The records show Defendant was bitten (*see* Jackson Medical Record 39), the bite would have been painful (*see* Briggle Dep. 66:7–20), and the bite could have caused temporary numbness (*see id.* 72:16–20).

The evidence — in the light most favorable to Plaintiff — does not *contradict* Defendant's statements; at best, it fails to *corroborate* them. Plaintiff's challenges to Defendant's credibility are based on her own speculative interpretation of the evidence. "Consequently, the evidence to which [Plaintiff] cites does not create a fact issue . . . and, therefore does not preclude summary judgment." *Penley*, 605 F.3d at 853 n.4 (alterations added).

### B. Use of Non-Lethal Force — the Taser

The parties' briefing regarding qualified immunity in the context of non-lethal force is cursory at best. Indeed, Plaintiff's entire argument on this issue is reduced to two lines, stating Defendant's use of the Taser is important here because the "sequence of events began with Officer Martin's unlawful tasing of Junior Prosper . . .[and] [t]he use of a Taser or stun gun in itself may

be excessive force." (Resp. 14 (alterations added; footnote call number omitted)). According to Defendant, "Eleventh Circuit precedent has ratified the use of a Taser in situations far less egregious than this one, even when the subject did not present a threat of violence to the officers." (Reply 13 (citations omitted)).

As it is undisputed Defendant was acting within the scope of his discretionary authority (*see* Resp. 4–5), Plaintiff must show Defendant's use of the Taser "was unconstitutional, and that the state of the law at the time was clearly established so as to provide 'fair warning' to [Defendant] that such conduct was unconstitutional." *Wate v. Kubler*, 839 F.3d 1012, 1019 (11th Cir. 2016) (alteration added; citations omitted). Plaintiff fails to make either showing. (*See generally* Resp.).

"The standard for whether the use of force was excessive under the Fourth Amendment is one of 'objective reasonableness.'" *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). A court looks to the "totality of circumstances" to determine whether the manner of arrest was reasonable. *Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004) (quotation marks and citation omitted). This analysis must "embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–397. "[T]he qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) (alteration added; quotation marks and citation omitted).

The relevant material facts, taken in the light most favorable to Plaintiff, show Defendant

knew, or could reasonably believe, Prosper (1) had fled the scene of an accident (*see* Pl.'s Add'l Facts ¶ 110); (2) was intoxicated (*see* Def.'s Facts ¶ 28); (3) was stumbling along the side of a busy highway (*see* Pl.'s Add'l Facts ¶ 114); (4) appeared disoriented (*see id.*); and (5) did not respond to verbal commands or verbally acknowledge Defendant (*see* Def.'s Facts ¶ 75). Additionally, Defendant engaged Prosper and the two lost their balance, tumbling down the embankment on the side of the road (*see* Pl.'s Reply Facts ¶ 47); and once Defendant regained his footing, Prosper still appeared disoriented and aggressive (*see* Pl.'s Add'l Facts ¶¶ 130–131).

Plaintiff disputes Defendant could reasonably believe Prosper was intoxicated or appeared aggressive. (*See* Pl.'s Reply Facts ¶¶ 21, 35; Pl.'s Add'l Facts ¶¶ 118–119, 130). Plaintiff relies on evidence adduced after the incident, asserting Prosper's toxicology report was negative and Prosper's behavior may have been caused by a stroke, seizure, or infection. (*See* Pl.'s Add'l Facts ¶¶ 115–118). This argument fails to persuade. Defendant's actions must be judged from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). The qualified immunity analysis "is limited to 'the facts that were knowable to the defendant officer[]' at the time [he] engaged in the conduct in question." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (alterations added; citation omitted). "Facts an officer learns after the incident ends — whether those facts would support granting immunity or denying it — are not relevant." *Id.*

Plaintiff provides an alternative explanation for Prosper's erratic behavior but fails to explain how Defendant could have known the results of the toxicology report or the expert's diagnosis *at the time* the incident was unfolding. An after-the-fact explanation is irrelevant to a qualified immunity analysis if the officer is incapable of reaching the conclusion at the time in question. Witnesses corroborate Prosper appeared intoxicated and aggressive. (*See* Sandoval

Dep. 150:6–10). Certainly, Plaintiff does not dispute that Prosper was disoriented, stumbling, could not maintain his balance, and refused to verbally communicate with Defendant. Under these circumstances, "a reasonable officer on the scene" would believe Prosper was intoxicated. *Graham*, 490 U.S. at 396 (citation omitted).

Plaintiff also cites two cases, *Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018) and *Kubler*, 839 F.3d at 1012, to support her claim Martin's use of a Taser was excessive. Notably, even if these cases were factually similar to the events here — which they are not — both cases post-date Defendant's use of his Taser and could not be used to show Prosper's right was clearly established at the time of the incident. *See Perez*, 809 F.3d at 1221 (citation omitted).

In *Glasscox*, the court found a constitutional violation after the repeated use of a taser on a suspect who was not resisting arrest; verbally communicated the intent to comply with the officer's commands; and was, in fact, attempting to comply with the officer's commands during the third and fourth discharge of the taser, which "was wholly unnecessary, and grossly disproportionate to the circumstances." 903 F.3d at 1216 (citation omitted). In *Kubler*, the court found a constitutional violation after the repeated use of a taser on a suspect who was handcuffed, immobilized, and unable to present a risk of flight or a threat of danger to the officers or the public. *See Kubler*, 839 F.3d at 1021. As Prosper continued to resist arrest, made no effort to comply with Defendant's requests, was not immobilized, presented a risk of flight, and was a threat to Defendant, these cases fail to present facts indistinguishable from those before the Court. *See Perez*, 809 F.3d at 1222.

Plaintiff provides no other support for her contention Defendant's use of the Taser violated Prosper's constitutional rights. (*See generally* Resp.). Defendant, for his part, provides multiple cases supporting his argument he did not violate Prosper's rights by discharging his Taser. (*See* Reply 13 (citing cases)). The Court must agree with Defendant.

The Eleventh Circuit has found an officer's initial use of a taser on a hand-cuffed, non-violent suspect did not violate the suspect's constitutional rights. *See Buckley v. Haddock*, 292 F. App'x 791, 799 (11th Cir. 2008). The Eleventh Circuit has also found an officer may use a taser on a non-compliant suspect without issuing a verbal arrest command. *See Draper*, 369 F.3d at 1278. Indeed, where a suspect appears aggressive and uncooperative, "use of a taser might be preferable to a 'physical struggle [causing] serious harm' to the suspect or the officer." *Fils v. City of Aventura*, 647 F.3d 1272, 1290 (11th Cir. 2011) (citation and quotation marks omitted; alteration in original). "[Eleventh Circuit] decisions demonstrate that the point at which a suspect is handcuffed and 'pose[s] no risk of danger to the officer' often is the pivotal point for excessive-force claims." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (first alteration added; citations omitted). The Eleventh Circuit "ha[s] held a number of times that severe force applied *after* the suspect is safely in custody is excessive." *Id.* (alteration added; citations omitted; emphasis in original).

The undisputed material facts show it was reasonable for Defendant to believe Prosper — who ignored repeated verbal commands, attempted to escape, and appeared visibly disoriented — was intoxicated and aggressive. (*See, e.g.*, Sandoval Dep. 154:12–16, 188:7–24; Pl.'s Add'l Facts ¶¶ 144–47; Resp. 3). At no point during the encounter was Prosper "safely in custody," *Mobley*, 783 F.3d at 1356, nor sufficiently restrained so as to pose no risk of danger to Defendant. Given the "'difficult, tense and uncertain situation[,]' the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (alteration added; citation omitted). Accordingly, Defendant's use of non-lethal force did not violate Plaintiff's constitutional rights, and Defendant is entitled to qualified immunity for the use

of the Taser.

### C. Use of Deadly Force — the Firearm

#### 1.     *Constitutional Violation*

During an arrest, an officer is justified in the use of deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  An officer will be entitled to qualified immunity in the absence of actual probable cause if he has arguable probable cause.  *See Garczynski*, 573 F.3d at 1167 (citation omitted).  "[B]ecause only arguable probable cause is required, the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) (citations omitted).  "Qualified immunity thereby protects officers who 'reasonably but mistakenly conclude that probable cause is present.'"  *Garczynski*, 573 F.3d at 1167 (citation omitted).

Plaintiff argues "there is zero evidence that [Prosper] pose[d] any objective threat to Officer Martin, and certainly not a threat warranting the use of deadly force."  (Resp. 3 (alteration added)).  Not so.  The undisputed facts show (1) Prosper was attempting to escape Defendant, who intended to arrest him (*see* Pl.'s Add'l Facts ¶¶ 144–147); (2) Prosper ignored repeated warnings to stop moving and stay on the ground (*see* Def.'s Facts ¶¶ 57, 78; Sandoval Dep. 188:7–24); and (3) Prosper bit Defendant during a physical altercation that resulted in Defendant discharging his firearm (*see* Def.'s Facts ¶¶ 61–69; Martin Dep. 138:13–21).

The facts critical to the Court's analysis relate to the bite and subsequent discharge of Defendant's firearm.  Defendant's account of the incident is straightforward: Prosper was biting

his finger; Defendant could not get Prosper to release his finger; and because Defendant feared Prosper might sever his finger, Defendant discharged his firearm at Prosper. (*See* Def.'s Facts ¶¶ 61–69). Plaintiff relies primarily on the Biscayne Air Video to dispute these facts. (*See* Pl.'s Reply Facts ¶¶ 61–69).

First, Plaintiff states the Biscayne Air Video shows "Prosper does not lunge at Martin" (Pl.'s Reply Facts ¶ 61), and also "show[s] Prosper did not twist and turn while biting Martin's finger, much less before he was shot" (*id.* ¶ 63 (alteration added)). These statements are not in fact supported by the Biscayne Air Video or any other record evidence. Plaintiff's own expert found "[y]ou certainly can't make out details, like, whether or not somebody's got a finger in the mouth or anything like that. So, there would be *no way to use that video evidence to either determine that it supports or refutes what took place*. It just doesn't answer the question." (Knox Dep. 87:15–20 (alteration and emphasis added)). Plaintiff cannot rely on the Biscayne Air Video to controvert facts regarding the bite, given the video is "evidence which merely permits conjecture or speculation." *Blackston*, 764 F.2d at 1482. Plaintiff's insistence the Biscayne Air Video reveals alternative facts about the bite are grounded in pure speculation and are therefore "not reasonable." *Id.*

Next, Plaintiff cites a DNA Report stating there was an "absence of Martin's DNA in Prosper's mouth." (Pl.'s Reply Facts ¶ 63 (citing DNA Report [ECF No. 132-9])). Plaintiff mischaracterizes the results of the DNA analysis — the forensic report shows only the blood around Prosper's mouth was Prosper's own blood. (*See generally* DNA Report). This is consistent with the other record evidence. (*See* Workers' Comp. Record [ECF No. 131-2] 68 (reporting Defendant was treated for exposure to blood or body fluid and Prosper was bleeding from the mouth when he bit Defendant's index finger and would not let go)).

The remaining evidence cited by Plaintiff — photos of Defendant's finger [ECF No. 103-11], Dr. Briggle's Deposition [ECF No. 103-12],[19] and paragraphs 164–171 of her facts — fail to controvert Defendant's testimony, and in fact support a finding that Prosper *did* bite Defendant. (*See* Pl.'s Reply Facts ¶ 63). Based on the lack of severity of the bite, Plaintiff seems to rely on this evidence to challenge the reasonableness of Defendant's application of deadly force. (*See* Pl.'s Add'l Facts ¶ 164–171). Yet, none of Plaintiff's evidence controverts Defendant's statement Prosper was biting his finger.

Based on the foregoing evidence, Plaintiff asks the Court to make the inference Defendant's finger became lodged in Prosper's mouth while Defendant was punching him. (*See id*. ¶¶ 157–158). To support this inference, Plaintiff references Defendant's Workers' Compensation Record and Deposition. (*See id.* ¶¶ 156, 158). Again, neither citation supports Plaintiff's characterization of events. (*See* Workers' Comp. Record 68 (stating Prosper "was bleeding from mouth when [Prosper] bit[] his left index finger and wound [sic] not let go. [Defendant] had to struggle to get his finger free." (alterations added)); Martin Dep. 135:13–21 ("Like I said, it's – when I was going down to make the contact [with the Taser], that's when Mr. Prosper hopped up and put my finger in his mouth." (alteration added))).

Plaintiff asks the Court to make an inference that is wholly speculative and not supported by any record evidence.[20] This, the Court will not do. "As the Supreme Court has instructed,

---

[19] "Q. And I think we mentioned earlier, clearly because there's tissue displacement and there was a bite mark there, there had to be a bite and simultaneous movement in order to create that level of damage, that level of displacement of the tissue? . . . THE WITNESS: Yes." (Briggle Dep. 68:23–69:4).

[20] Plaintiff does not point to, nor has the Court found, any record or account of the bite that contradicts Defendant's statement. Indeed, the evidence supports only one version of events — Defendant's. (*See, e.g.*, Williams Dep. 21:5–9 ("Q. You did hear [Defendant] saying, 'He's biting me'? A. Yes, 'My finger, he's biting me.' Q. And then after he said, 'He's biting me,' is that when he went silent? A. After shots were fired." (alteration added)); White Dep. 17:16–17 ("[Defendant] said something to the fact that he thought the guy bit his finger off."); First Jackson Medical Record 39 ("[Defendant] was bit on his left

---

'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Perez*, 809 F.3d at 1221 (citation omitted; alteration in original). There is no evidentiary support for Plaintiff's version of the events, nor is there any evidence to controvert Defendant's version.

Taken together, the undisputed facts show "a reasonable officer could — and likely would — have perceived [Prosper] as posing an imminent threat of serious physical harm." *Martinez v. City of Pembroke Pines*, 648 F. App'x 888, 893 (11th Cir. 2016) (alteration added) (finding use of deadly force reasonable where suspect ignored the officers' commands and, while still handcuffed, suddenly advanced to within a few feet of the defendant).

The clear and imminent threat posed by Prosper biting Defendant entitles Defendant to qualified immunity because "[i]t is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others." *Id.* (citing *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (alteration added; other citation omitted)). Again, the undisputed facts[21] show (1) Prosper

index finger over the PIP joint today by another human." (alteration added)); Second Jackson Medical Record 38 ("[Defendant] is a police officer and was arresting someone when the person bit the officer's index finger causing dorsal and volar wounds over the PIP joint. At his time, the patient is reporting pain in the left index finger." (alteration added)); University of Miami Medical Record ("[Defendant] presents to workers' compensation clinic for human bite he sustained on 9/28/15 during an altercation while working as a police officer." (alteration added)); Workers' Comp. Incident Report [ECF No. 131-6] ("[Defendant] WAS BITTEN BY A HUMAN ON THE LEFT HAND WHICH WAS BLEEDING . . . ." (alteration added)); OMCA Medical Record [ECF No. 131-7] 4 ("[Defendant] had left index finger laceration after human bite on 09/28/2015 . . . ." (alteration added)).

[21] Plaintiff does not deny any of the specific facts on which the Court relies with citations to record evidence beyond the Biscayne Air Video. (*See generally* Pl.'s Reply Facts; Pl.'s Add'l Facts). Plaintiff's denials are thus insufficient. *See Garczynski*, 573 F.3d at 1165 ("A genuine dispute requires more than some metaphysical doubt as to the material facts. . . . A mere scintilla of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." (internal quotation marks and citations omitted; alteration added)).

"continu[ed] to resist arrest" (Def.'s Facts ¶ 57); (2) the Taser "had no effect on Prosper" (*id.* ¶ 60);[22] (3) Prosper and Defendant were engaged in a physical confrontation on the ground prior to Defendant's use of deadly force (*see id.* ¶¶ 61–66; Pl.'s Add'l Facts ¶¶ 156–158); and (4) Prosper bit Defendant prior to the use of deadly force (*see* Def.'s Facts ¶¶ 61–67; *see also* Pl.'s Add'l Facts ¶¶ 157–159). These facts are indistinguishable from those in *Martinez*, where the arrestee was "unresponsive to all commands and gestures, impervious to the [T]aser, and otherwise unable to be restrained." *Martinez*, 648 F. App'x at 893 (alteration added). Accordingly, Defendant's "decision to use deadly force was reasonable under the circumstances, and thus in compliance with the Fourth Amendment." *Id.* at 894.

### 2.    *Clearly Established Law*

Even assuming a constitutional violation, Defendant is entitled to qualified immunity unless Plaintiff can show Prosper's Fourth Amendment rights were clearly established at the time of the shooting. *See id.* This requires citation to decisions of the Supreme Court, Eleventh Circuit, or the highest relevant state court. *See McClish*, 483 F.3d at 1237. It is Plaintiff's burden to "demonstrate that, from the preexisting law, the deputy had 'fair and clear notice' that the deputy's conduct would break federal law." *Buckley*, 292 F. App'x at 797 (citations omitted).

Plaintiff relies primarily on the August 31, 2018 Order and the cases the Court cited there. (*See generally* Resp. 16–17). Plaintiff also includes citations to the following Eleventh Circuit case law: *Glasscox*, 903 F.3d 1207; *St. George v. Pinellas County*, 285 F.3d 1334 (11th Cir. 2002);

---

[22] Plaintiff fails to cite any evidence to controvert Defendant's statement. (*See* Pl.'s Reply Facts ¶ 60). The evidence shows Prosper continued to ignore verbal commands and attempt to escape after use of the Taser. (*See* Def.'s Facts ¶¶ 50, 52, 56; *see also* Resp. 3). This fact is therefore admitted.

and *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005).[23] Neither the Court's Order nor the cases cited address facts directly comparable to the undisputed facts in this case. Once again, only "indistinguishable facts" can clearly establish a constitutional violation. *Perez*, 809 F.3d at 1222 (citation omitted).

Plaintiff fails to discern the difference between the law applicable to a motion to dismiss and a motion for summary judgment. The August 31, 2018 Order made clear the "Court understands a wealth of evidence may exist to contradict Plaintiff's claim." (*Id*. 13). The undersigned then noted "[a]t this stage of proceedings, the Court must credit Plaintiff's allegations [in the TAC] and draw all reasonable inferences in her favor." (*Id*. (alteration added)). By crediting the allegations in the TAC as true, the Court found "[u]nder Eleventh Circuit precedent, the use of deadly force against Prosper — who was unarmed, fleeing from Defendant, and allegedly did not pose a threat — violated Prosper's Fourth Amendment right to be free from excessive force." (*Id*. 12 (alteration added; citation omitted)). Based on those allegations made by Plaintiff, the Court found *Tolan v. Cotton*, 572 U.S. 650 (2014), and *Gaillard v. Commins*, 562 F. App'x 870 (11th Cir. 2014), were "clearly 'particularized to the facts of [this] case.'" (Order 13 (citation omitted; alteration in original)).

With discovery completed, the record does not support the referenced allegations of the TAC. Plaintiff "may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (quotation marks and citation omitted). The facts show Prosper unquestionably posed a threat to Defendant. Prosper appeared hostile and aggressive (*see* Sandoval Dep. 150:6–10; Martin Dep. 74:16–20);

---

[23] Plaintiff fails to complete her argument regarding *Mercado*. (*See* Resp. 18). Plaintiff's Response ends abruptly mid-explanation before moving on to a new argument. (*See id*. 18–19). Nevertheless, the Court considers *Mercado* in addition to Plaintiff's other arguments.

ignored repeated verbal commands (*see* Def.'s Facts ¶ 78; Sandoval Statement 33:15–17); was non-compliant after the use of Defendant's Taser (*see* Def.'s Facts ¶ 60); and bit Defendant's finger during a physical altercation on the ground (*see* Def.'s Facts ¶ 61; Martin Dep. 135:13–21).

In *Tolan*, the unarmed suspect was shot, on his knees, from 15 to 20 feet away, *see* 572 U.S. at 653; and the fleeing suspect in *Gaillard* died from injuries received when he was struck by a patrol car without posing any threat to a police officer or third party, *see* 562 F. App'x at 875. Considering the undisputed facts here, it no longer remains true that these cases provide "'fair and clear notice' that the [Defendant's] conduct would break federal law." *Buckley*, 292 F. App'x at 797 (alteration added; citations omitted).

As to the other cases Plaintiff cites: *Glasscox* considered the repeated use of a taser on a non-threatening suspect who was attempting to comply with the officer's commands, *see* 903 F.3d at 1216; *St. George* was decided at the motion-to-dismiss stage and assumed the suspect was neither threatening the officer nor in a position of flight by accepting as true the complaint's allegations, *see* 285 F.3d at 1338; and *Mercado* considered a suicidal subject who "was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was shot in the head," 407 F.3d at 1157–58. None of the cases Plaintiff provides have "indistinguishable facts clearly establishing [Plaintiff's] constitutional right." *Perez*, 809 F.3d at 1222 (alteration added; internal quotation marks and citation omitted).

As Plaintiff fails to cite any case with materially similar facts from the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida which might have given Defendant fair warning his actions were unconstitutional, "[Plaintiff] can surmount the qualified immunity hurdle only if [Defendant's] conduct was 'so far beyond the hazy border between excessive and acceptable force that [Defendant] had to know he was violating the Constitution even without case law on point.'"

*Alday v. Groover*, 601 F. App'x 775, 778 (11th Cir. 2015) (alterations added; citation and quotation marks omitted). Plaintiff appears to suggest this hurdle has been met but provides no analysis in support. (*See* Resp. 19).

Tellingly, Plaintiff includes nothing except a conclusory quote and a citation to *Perez*, 809 F.3d at 1223.[24] (*See* Resp. 19). In addition to being decided after the fatal encounter between Defendant and Prosper took place, *Perez* deals with facts clearly distinguishable from those here. *See* 809 F.3d at 1219. In *Perez*, witnesses testified that at the time of the shooting, the suspect was subdued, compliant, and on the ground with his arms restrained, before being subjected to deadly force without warning. *Id.* Unlike the suspect in *Perez*, Prosper was not subdued, compliant, or restrained. (*See* Def.'s Facts ¶¶ 60–69). Given Prosper's erratic behavior, failure to comply with verbal commands, and physical assault on Defendant, Defendant's conduct was not "so far beyond the hazy border between excessive and acceptable force that [Defendant] had to know he was violating the Constitution even without caselaw on point." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (alteration added).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Final Summary Judgment **[ECF No. 102]** is **GRANTED**. Final judgment will be entered by separate order. The Clerk is directed to mark this case **CLOSED**, and all pending motions are **DENIED as moot**.

---

[24] Plaintiff incorrectly cites the case as *Pearson v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016). (*See id.*).

**DONE AND ORDERED** in Miami, Florida, this 1st day of July, 2019.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record